IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

STEPHEN SOTELO, individually and on )
behalf of all persons similarly situated, )
)
Plaintiff, )
) No. 05 C 2562
v. )
) Judge Robert W. Gettleman
DIRECTREVENUE, LLC; DIRECTREVENUE )
HOLDINGS, LLC; BETTERINTERNET, LLC; )
BYRON UDELL & ASSOCIATES, INC., d/b/a )
ACCUQUOTE; AQUANTIVE, INC. and )
JOHN DOES 1-100, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Stephen Sotelo filed a five-count putative class action complaint against

defendants DirectRevenue, LLC ("DR"), DirectRevenue Holdings, LLC ("DR Holdings"), and

BetterInternet LLC ("BI") (collectively, "Direct Revenue"), and Byron Udell & Associates, Inc.,

d/b/a AccuQuote ("AccuQuote") and aQuantive, Inc. ("aQuantive"), alleging that, without his

consent, defendants caused software known as "spyware"[1] ("Spyware") to be downloaded onto

his personal computer. Plaintiff alleges that Spyware tracked plaintiff's Internet use, invaded his

privacy, and caused substantial damage to his computer. Plaintiff asserts various claims under

Illinois law: trespass to personal property (Count I); consumer fraud (Count II); unjust

---

[1]Plaintiff defines spyware, also referred to as "adware," as "computer software
downloaded to an end-user's computer over the Internet, without consent, that permits the
company who downloaded the software (i.e., the spyware company) to track, profile, and analyze
a computer user's behavior, for the purpose of sending him or her targeted advertising, which the
spyware company can place for its clients."

1

enrichment (Count III); negligence (Count IV); and computer tampering (Count V). Plaintiff seeks injunctive relief and compensatory damages.

Defendants removed the class action to federal district court pursuant to 28 U.S.C. § 1332(d)(2) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1453.[2] Defendants have filed five motions: (1) DR Holdings's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2); (2) DR, BI, and AccuQuote's combined motion to stay litigation in favor of arbitration pursuant to § 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3; (3) AccuQuote's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6); (4) aQuantive's motion to dismiss pursuant to Rule 12(b)(6); and (5) DR and BI's combined motion to dismiss pursuant to Rule 12(b)(6).

For the reasons discussed herein, defendants' motions are denied in part and granted in part.

## FACTS

Defendant BI is a Delaware limited liability company with its principal place of business in New York, New York. Defendant DR is, upon information and belief, the sole member and manager of BI. Defendant DR Holdings is a Delaware limited liability with its principal place of business in New York, NY, and the holding company for BI and DR. Defendant AccuQuote, an Illinois corporation with its principal place of business in Wheeling, Illinois, sells life insurance

---

[2]The CAFA, Pub.L. 109-2, 119 Stat. 4, provides that class-action diversity jurisdiction exists if the amount in controversy exceeds $5,000,000 and any member of the class of plaintiffs is a citizen of a state different from any defendant. Pfizer, Inc. v. Lott,    F.3d —, 2005 WL 1840046, at *1 (7th Cir. Aug. 4, 2005), Knudsen v. Liberty Mut. Ins. Co., 411 F.3d 805, 806 (7th Cir. 2005). CAFA applies only to suits commenced on or after the date of enactment, February 18, 2005. Id.

on the Internet. Defendant aQuantive is a publicly traded Washington corporation headquartered in Seattle, Washington, that is a marketing company that acts as an advertising agent for companies that advertise their products on the Internet. At times relevant to this lawsuit, aQuantive maintained two offices in Chicago, Illinois.

Plaintiff alleges that DirectRevenue deceptively downloaded Spyware, distributed by BI, on thousands of computers. Spyware allows DirectRevenue and companies that employ its services to track a computer user's web browsing behavior in order to deliver targeted advertisements to that computer. For example, if a computer with Spyware views music-related Internet sites, Spyware sends a signal of the computer user's activity back to DirectRevenue, which then targets the computer with advertisements from music-related companies that have paid for access to the computer via Spyware. DirectRevenue claims access to 12,000,000 computers in the United States, and has attracted national media attention and criticism for its alleged misconduct in gaining and maintaining such access.[3] According to plaintiff, aQuantive and AccuQuote, or someone on their behalf, used Spyware to send advertisements to the computers.

DirectRevenue "secretly installs" Spyware by bundling it with other legitimate software that is available "free" on the Internet, such as games. When the computer user downloads and installs a game, he or she simultaneously, but unwittingly, downloads Spyware. "The computer

---

[3]Plaintiff includes excerpts of an article from the December 12, 2004, issue of <u>Newsweek</u>, stating, "Industry watchers familiar with [DirectRevenue] say it has stooped as low as any of its rivals in the practices it uses to distribute its software." The article also asserts, "Consumer advocates familiar with the company charge that DirectRevenue has engaged in an array of unethical practices: it secretly installs its software onto computers, designs its adware so that it reinstalls after users delete it and has changed its name so often that frustrated users can't find the company to complain."

3

users do not consent, let alone have knowledge," that Spyware is being installed on their computers because DirectRevenue has "deceptively caused" Spyware to download without the users' consent or knowledge. DirectRevenue has an agreement governing Spyware called the "BetterInternet End User License Agreement" ("EULA") that purports to inform a consumer that Spyware will be installed, computer use will be monitored, and the computer will receive targeted advertisements.

According to plaintiff, DirectRevenue installs Spyware in at least three different ways to avoid showing the EULA to computer users. First, for computers with Microsoft settings set to "low," Spyware automatically installs when a user downloads a free software program. These users are "never even shown the [EULA], told of its existence, or advised of the need for any sort of licensing." Second, computer users who have Microsoft Windows' Service Pack 2 (a security feature) installed on their computers receive a pop-up dialog box as the Spyware is being downloaded. The message in the dialogue box is an "unintelligible" incomplete sentence, refers only to "'the software,' rather than a bona fide program name," and asks the user to click "Install" or "Don't Install." There is no disclosure that the software being downloaded includes Spyware. There is a link to the EULA, but users are not asked to click on the link, advised of the availability of the EULA, or asked to agree to the EULA. Third, Internet users without Microsoft Windows Service Pack 2 are asked to agree to a "Consumer Policy Agreement," but not to the EULA, and there is no such policy available on DirectRevenue's website or elsewhere for computer users to review.

According to plaintiff, Spyware is designed to be difficult to remove from a computer once it is installed. DirectRevenue engages "in a uniformly deceptive course of conduct" to

4

prevent users from removing Spyware after it is installed, including changing its name to prevent disgruntled computer users from complaining and altering the Spyware file names so that anti-Spyware programs and computer technicians cannot locate and remove it. DirectRevenue uses misleading aliases in an effort to deceive consumers including: BestOffers, BetterInternet, Ceres, LocalNRD, MSView, MultiMPP, MXTarget, OfferOptimizer, and Twaintec. The EULA, if users ever see it, directs users who want to remove Spyware from their computers to a website address, http://mypctuneup.com/contacts.php. However, at the time of the complaint, the link did not connect to a web page, and no such site could be found. If a user attempts to use the "add or remove programs" feature to remove the legitimate software to which Spyware was bundled, Spyware "unbundles" and remains on the computer.

Through Spyware, advertisers and advertising agents, including aQuantive and AccuQuote, have access to millions of computers for their targeted advertising. These advertisers, or companies they have hired to advertise on their behalf, bombard users' computers with ads that constantly "pop up" over whatever web page a user is viewing. The pop-up advertisements are sent in a manner that breaches the security of affected computers by bypassing commonly-used software designed to block pop-ups. Once an advertisement is sent, it generally remains on the computer screen until the computer user actually closes the advertisement. Even after closing the advertisement, however, it is sent over and over again, and users receive many advertisements repeatedly. According to plaintiff, "Newsweek reported that Direct Revenue may have as many as 1.5 billion advertising impressions (i.e., pop-ups) per month."

Plaintiff alleges that Spyware wreaks havoc on a computer and its user. Spyware destroys other software programs, and Spyware and the unsolicited advertisements that clog the screen

5

cause computers to slow down, deplete Internet bandwidth and the computer's memory, and use pixels and screen-space on monitors. Productivity is decreased because hours are wasted attempting to remove Spyware from computers, closing recurring and frequent advertisements, and waiting for slowed machines. Users are forced to keep their slowed computers running longer, which uses more electricity, decreases the useful life of an computer, and forces the user to incur increased Internet access charges. It costs approximately $30 per year to purchase software to effectively remove Spyware and unwanted advertisements, and to guard against future infections.

## DISCUSSION

**I.      DR Holdings's motion to dismiss for lack of personal jurisdiction**

DR Holdings argues that the complaint against it should be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction because it is merely the parent of defendant DR , which is the parent of BI, and DR Holdings did not engage in any of the conduct at issue in plaintiff's complaint.

Plaintiff bears the burden of establishing a prima facie case for personal jurisdiction. See, Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 939 (7th Cir. 2000); Steel Warehouse of Wisc. Inc. v. Leach, 154 F.3d 712, 714 (7th Cir. 1998). To demonstrate that a defendant has sufficient "minimum contacts" with the forum state to support the exercise of personal jurisdiction, a plaintiff may establish the existence of either general or specific jurisdiction. Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 713-24 (7th Cir. 2002). When determining personal jurisdiction over a defendant, the court can consider affidavits submitted by the parties, see Kontos v. U.S. Dept. of Labor, 826 F.2d 573, 576 (7th Cir.

6

1987), and "must accept all undenied factual allegations and resolve all factual disputes in favor of the party seeking to establish jurisdiction." Saylor v. Dyniewski, 836 F.2d 341, 342 (7th Cir. 1988). The court has jurisdiction over a non-resident, non-consenting defendant in a diversity case if Illinois state courts would have jurisdiction. McIlwee v. ADM Industries, Inc., 17 F.3d 222, 223 (7th Cir.1994); RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1275 (7th Cir.1997). "The Illinois long-arm statute permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitution." Central States, 230 F.3d at 940, citing 735 Ill. Comp. Stat. 5/2-209(c).

According to the affidavit of Joshua Abram ("Abram"), chief executive officer of DR Holdings, it does not "engage in any of the Internet-related business activities that are alleged in the Complaint" or "distribute [Spyware] or 'pop-up advertising' on the Internet." DR Holdings is not registered to do business in Illinois, and does not maintain any websites that are accessible to customers in Illinois, maintain any offices, facilities, bank accounts or personnel in Illinois, or conduct any business in Illinois. Thus, DR Holdings lacks the "minimum contacts" with the forum state that would justify the exercise of personal jurisdiction. FMC Corp. v. Varonos, 892 F.2d 1308, 1311 n. 5 (7th Cir.1990), citing International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement, 326 U.S. 310, 316 (U.S. 1945). DR Holdings has not "purposefully avail[ed] itself of the privilege of conducting activities in Illinois, Hanson v. Denckla, 357 U.S. 235, 253 (1958), and could not "reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985), quoting World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286 (U.S. 1980).

Plaintiff's opposition to DR Holdings's motion to dismiss relies almost entirely on citations to DR Holdings's filings in a case before the District Court for the Western District of Washington, Avenue Media, N.V. v. Directrevenue, LLC, et al., No.04-CV-02371C (W.D.Wa. Dec. 15, 2004), and the judge's order in that case denying the plaintiff's motion for a temporary restraining order ("TRO"). The defendants in Avenue Media - DR, DR Holdings, and BI - filed a joint brief in opposition to the plaintiff's motion for a TRO, which states, "Defendants [DR], [DR Holdings], and [BI] operate a leading internet business headquartered in New York. Defendants' operations include Offeroptimizer.com[4]..." Abram filed an affidavit in support of the brief.

In the instant case, plaintiff argues that the defendants' argument, Abram's affidavit, and the court's finding in Avenue Media establish that DR, BI, and DR Holdings should be viewed collectively for jurisdictional purposes. Plaintiff's accusations that DR Holdings is "willing to tell directly contradictory stories, under oath, to different Federal courts," and that Abram is lying in his affidavit submitted to this court are hyperbolic. The arguments and affidavits in Avenue Media are not relevant here because DR Holdings has raised independent grounds for its dismissal from the instant case that it did not raise before the Washington court. In particular, the filings and the court's order in Avenue Media address the defendants collectively, whereas in the instant motion, DR Holdings seeks to distinguish itself from its subsidiaries, DR and BI. DR Holdings's arguments and affidavits regarding its distinct jurisdictional posture as a holding company are not foreclosed by the "judicial admissions" in Avenue Media, which did not

---

[4]Plaintiff in the instant case argues that Offeroptimizer.com is available to consumers in Illinois and is "one of the very sources of the unlawful advertisements and [Spyware] files alleged to exist in this case."

differentiate between the defendants and do not contradict DR Holdings's more specific affidavit testimony in the instant case.

Plaintiff, overly focused on the Avenue Media documents, fails to address DR Holdings's central argument that as a holding company it is not subject to personal jurisdiction here. Significantly, plaintiff does not deny DR Holdings's testimony that it did not have any contact with Illinois. See Turncock v. Cope, 816 F.2d 332, 333 (7th Cir. 1987) (when determining whether plaintiff has met burden of establishing a prima facie showing of jurisdiction, allegations in plaintiff's complaint are taken to be true unless controverted by the defendant's affidavits or exhibits). As a general rule, "the jurisdictional contacts of a subsidiary corporation are not imputed to the parent." Purdue Research Foundation v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 787 n. 17 (7th Cir. 2003) (collecting cases); see also Central States, 230 F.3d at 943 ("[W]e hold that constitutional due process requires that personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone when corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary."). A holding company that neither transacts business nor contracts to provide products or services in Illinois is not subject to personal jurisdiction in Illinois. Androphy v. Smith & Nephew, Inc., 31 F. Supp. 2d 620, 622 (N.D.Ill. 1998). A plaintiff's allegation that one defendant is the parent of another defendant is insufficient to support the exercise of specific jurisdiction absent "evidence that justifies piercing the corporate veil" or evidence that "the subsidiaries were acting as the parent's agent." Salon Group, Inc. v. Salberg, 156 F. Supp. 2d 872, 876 (N.D.Ill. 2001).

The only allegation in plaintiff's complaint specifically addressed to DR Holdings is that DR Holdings is a holding company for BI and DR. This lone allegation is insufficient to establish "continuous or systematic contacts," as required to justify the exercise of general jurisdiction, or that the allegations arise out of or are related to DR Holdings's forum contacts. In addition, plaintiff has failed to allege or make any effort to demonstrate that the corporate veil should be pierced or that BI and DR were acting as DR Holdings's agent. See Salon Group, 156 F. Supp. at 876. Accordingly, the court grants DR Holdings's motion to dismiss for lack of personal jurisdiction.[5]

## II.     DirectRevenue and AccuQuote's motion to stay litigation in favor of arbitration

DirectRevenue and AccuQuote argue that the instant litigation must be stayed pursuant to § 3 of the FAA, 9 U.S.C. § 3, and the EULA, which contains an arbitration clause ("Arbitration Clause"). The Arbitration Clause requires the parties to submit "any and all disputes, controversies and claims relating in any way to [BI's targeted advertising software], this Agreement or the breach thereof (including the arbitration of any claim or dispute and the enforceability of this paragraph)" to arbitration before the American Arbitration Association in New York, New York. Plaintiff does not challenge defendants' assumption that the Arbitration Clause would apply to the instant dispute, but argues that he never saw or agreed to the EULA prior to the installation of Spyware on his computer, and therefore is not bound by its terms.

The FAA mandates enforcement of valid, written arbitration agreements. 9 U.S.C. § 2; Tinder v. Pinkerton Security, 305 F.3d 728, 733 (7th Cir. 2002). To give effect to the federal policy, § 3 of the FAA provides for stays of litigation when an issue presented in a case is

---

[5]Subsequent references to DirectRevenue refer to BI and DR only.

10

referable to arbitration. 9 U.S.C. § 3; Tinder, 305 F.3d at 733. "Because arbitration is a matter of contract, a party cannot be required to submit to arbitration if it has not agreed to do so." AT & T Techs., Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986). The Seventh Circuit has held that agreements to arbitrate are evaluated under the same standards as any other contract. Tinder, 305 F.3d at 733. A district court must promptly compel litigation once it is satisfied that the parties agreed to arbitrate, but if the district court determines that the making of the arbitration agreement is seriously disputed, "the court shall processed summarily to the trial thereof." 9 U.S.C. § 2. "The party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." Tinder, 305 F.3d at 735. Although the FAA does not expressly identify the evidentiary standard a party seeking to avoid compel arbitration must meet, the Tinder court held that it is analogous to the standard under Fed. R. Civ. P. 56(e): "the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists." Id.

In Tinder, an employment discrimination suit, the Seventh Circuit held that the district court had correctly compelled the plaintiff to arbitrate because she failed to raise a triable issue of fact. Id. The plaintiff did not contradict the defendants' affidavits that she was "definitely" provided with a brochure containing her employer's arbitration provision. Id. at 735-36. In the instant case, by contrast, defendants make no such assertions regarding plaintiff in particular. Rather, they submit affidavit testimony that every time Spyware is installed from DirectRevenue's website, the computer user is presented with the opportunity through a hyperlink to read the EULA prior to downloading the software. According to the affidavit of Christopher Dowhan ("Dowhan"), vice-president of distribution for DR, users downloading

11

DirectRevenue's software cannot proceed until "they have that opportunity and either take advantage of it or opt to skip it." Even if uncontroverted and sufficient to establish that users were "definitely" provided with the opportunity to view the EULA on DirectRevenue's website, Dowhan's affidavit testimony is defeated by plaintiff's clarification in his affidavits that he downloaded software bundled with Spyware from a third-party distributor and never visited DirectRevenue's website.[6] Plaintiff has thus raised a triable issue of fact whether he agreed to the EULA, or was even provided with notice of its existence.

DirectRevenue and AccuQuote also argue that each advertisement that plaintiff alleges he received as a result of Spyware "would have contained a link with yet another opportunity to view the EULA." According to DirectRevenue and AccuQuote, clicking on a small button with question mark in the corner of the pop-up advertisements leads to additional information about Spyware, another opportunity to read the EULA, and instructions on how to uninstall Spyware. The question box does not indicate that it links to information regarding the source of the advertisements or to any kind of user agreement, however. Moreover, by the time plaintiff began receiving the advertisements Spyware had already been installed, and the computer damage had begun.

---

[6] The court agrees with DirectRevenue and AccuQuote that plaintiff's assertion that he never visited the DirectRevenue website and never viewed the EULA raises questions about his ability to serve as named plaintiff for the first putative sub-class of plaintiffs. Plaintiff defines this class as users who "had [Spyware] downloaded from an Internet site that displayed to them a copy of [the EULA]." Claims of this sub-class may be subject to mandatory arbitration, if the Arbitration Clause is found to apply and to be enforceable. The court notes that none of the myriad affidavits from putative class members filed by plaintiff in connection with the pending motions state that the computer user viewed the EULA or agreed to its terms, suggesting that plaintiff may choose not to pursue claims on behalf of the first sub-class. The instant motion, however, does not concern class certification, and questions about plaintiff's ability to represent the class and the definition of sub-classes are not before the court at this time.

12

ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1450-53 (7th Cir. 1996), cited by DirectRevenue in support of its argument, is thus inapposite. In ProCD, the Seventh Circuit held that a license agreement was enforceable because the plaintiff was given notice of the existence of a license agreement before purchasing a product, although the terms of the agreement were sealed inside the package, and purchasers had the opportunity to return the product if the terms were unacceptable. Here, by contrast, plaintiff claims that he was not given notice of the EULA's existence prior to installation, Spyware begins consuming computer resources when it is installed, and uninstalling Spyware is significantly more confusing and vexing process than returning a product.

Because the court finds that plaintiff has raised a triable issue of fact whether he agreed to the EULA, the court need not address the parties' other arguments about the validity and the enforceability of the Arbitration Clause, or whether it inures to the benefit of third parties.[7] Accordingly, DirectRevenue and AccuQuote's motion to stay the instant litigation in favor of arbitration is denied.

## III. Trespass to personal property (Count I)

Count I asserts a claim for trespass to personal property/chattels against all defendants. Defendants argue in three separate motions to dismiss that Count I fails to state a claim upon which relief may be granted because plaintiff fails to plead causation and damages as required to

---

[7]Defendants posit acceptance of the EULA and plaintiff's alleged "authorization" of the download of Spyware as a reason to dismiss each of plaintiff's claims. The court, however, will not address this argument regarding the claims discussed below because it finds that plaintiff has sufficiently alleged that he did not consent to the installation of Spyware on his computer.

13

state a trespass to personal property claim. For the reasons discussed below, the court denies defendants' motions to dismiss Count I.

In ruling on a motion to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992). A complaint should not be dismissed for failure to state a claim unless there is no doubt that the plaintiff cannot prove a set of facts that would entitled her to relief based on her claim. Pressalite Corp. v. Matsushita Electric Corp. of America, 2003 WL 1811530, at *2 (N.D.Ill. Apr. 4, 2003). The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide its merits. See Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir. 1990).

There is sparse Illinois case law from the last century addressing the elements of trespass to personal property, which had become a little-used caused of action, and all parties rely primarily on treatises and secondary sources. The Illinois Law and Practice Treatise states, "An injury to or interference with possession, with or without physical force, constitutes a trespass to personal property." ILLINOIS LAW & PRACTICE, § 3, Trespass to Personal Property. According to the Restatement of Torts, there are two ways to commit this tort: "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." RESTATEMENT (SECOND) OF TORTS, § 217. Harm to the personal property or diminution of its quality, condition, or value as a result of a defendant's use can also result in liability. RESTATEMENT (SECOND) OF TORTS, § 218(b). Plaintiff in the instant case alleges that by installing Spyware defendants "intentionally intermeddled with,

14

damaged, and deprived Plaintiffs of their computers and/or Internet connections, or a portion thereof."

AQuantive cites several cases that equate trespass to personal property with conversion, which has been addressed more frequently by modern courts. See, e.g., Minuti v. Johnson, 2003 WL 260705, at * 4 (N.D.Ill. Feb. 5, 2003) (equating the elements of trespass to chattels with conversion[8] where defendant maintained possession of property). AQuantive argues that plaintiff in the instant case fails to allege that he made any demand for or was refused the return of his property, which is an element of a conversion claim. The court agrees with plaintiff, however, that the two causes of action are distinct in cases such as this, where plaintiff does not allege his property is in defendant's possession or has been rendered entirely worthless, but rather that it was interfered with. See W. Prosser & W. Keeton, Torts § 14, 85-86 (5th ed. 1984) ("[The claim of trespass to personal property's] chief importance now, is that there may be recovery ...for interference with the possession of chattels which are not sufficiently important to be classified as conversion... ."); CompuServe Inc. v. Cyber Promotions, Inc., 962 F. Supp. 1015, 1022 (S.D. Ohio 1997) ("A plaintiff can sustain an action for trespass to chattels, as opposed to an action for conversion, without showing a substantial interference with its right to possession of that chattel."). The question, then, is whether plaintiff has sufficiently pled the elements of trespass to personal property.

---

[8]The elements of a conversion claim are: (1) defendant's unauthorized and wrongful assumption of control; (2) plaintiff's right in the property; (3) plaintiff's right to immediate possession; and (4) plaintiff's demand for possession. Minuti, 2003 WL 260705, at *4.

In recent years, trespass to personal property, which had been largely relegated to a historical note in legal textbooks, has reemerged as a cause of action in Internet advertising and e-mail cases. A series of federal district court decisions, beginning with CompuServe, Inc., has approved the use of trespass to personal property as a theory of liability for "spam e-mails" sent to an Internet service provider ("ISP") based upon evidence that the vast quantities of spam e-mail overburdened the ISP's own computer and made the entire computer system harder to use for computer users, the ISP's consumers. See also America Online, Inc. v. IMS, 24 F. Supp. 2d 548 (E.D.Va. 1998); Hotmail Corp. v. Van$ Money Pie Inc., 1998 WL 388389 (N.D.Cal. Apr. 16, 1998); America Online, Inc. v. LCGM, Inc., 46 F. Supp. 2d 444 (E.D.Va. 1998); America Online, Inc. v. Prime Data Systems, Inc., 1998 WL 34016692 (E.D.Va. Nov. 20, 1998).

Although the above cases do not apply Illinois law, the law regarding trespass to personal property applied is substantially similar to that used in Illinois, and the courts' reasoning is applicable to the instant case. Defendants' attempt to distinguish these cases on the basis that the plaintiffs were ISP's, not individual computers users like plaintiff in the instant case, is unpersuasive. The elements of trespass to personal property - interference and damage - do not hinge on the identity of the plaintiff, and the cause of action may be asserted by an individual computer user who alleges unauthorized electronic contact with his computer system that causes harm, such as Spyware.

DirectRevenue argues that even if trespass to personal property is a viable cause of action, plaintiff in the instant case has failed to state such a claim because he fails to properly plead causation and damages to his computer. See Najeb v. Chrysler-Plymouth, 2002 WL 31906466, at *10-11 (N.D.Ill. Dec. 31, 2002) (damages are a required element of trespass to

16

chattels claim).  Plaintiff, however, has specifically alleged that he is similarly situated to the putative class plaintiffs, and that Spyware is the proximate cause of significant and cumulative injury to computers, including his, and interferes with their use.  According to plaintiff, Spyware "bombards" users' computers with pop-up advertisements that obscure the web page a user is viewing and "destroys other software on a computer."  Plaintiff also alleges that Spyware and the resource-consuming advertisements sent to a computer by Spyware cause computers to slow down, take up the bandwidth of the user's Internet connection, incur increased Internet-use charges, deplete a computer's memory, utilize pixels and screen-space on monitors, require more energy because slowed computers must be kept on for longer, and reduce a user's productivity while increasing their frustration.

Many companies and computer users consider pop-up advertisements and Spyware an Internet scourge, as evidenced by media reports and on-line complaints, such as those submitted by plaintiff, and by mounting lawsuits filed across the country. Several courts have granted preliminary injunctions to plaintiffs who have alleged that their computer equipment and systems were impaired in similar ways, finding that the harm alleged could state a trespass to chattels claim.  For example, in CompuServe, the defendant was in the business of sending bulk unsolicited e-mail advertisements, sometimes called "spam,"to subscribers of Compuserve.  962 F. Supp. 1015.  The CompuServe court held the element of damage to the system could be established by the fact that the "multitudinous electronic mailings demand the disk space and drain the processing power of plaintiff's computer equipment," and impose added inconvenience and Internet connection costs on CompuServe's customers.  962 F. Supp. at 1022; see also Hotmail, 1998 WL 388389, at *7 (defendant transmitted tens of thousands of misdirected,

17

unauthorized e-mail messages to plaintiff, thereby filling up the plaintiff's computer storage space, threatening to damage the plaintiff's ability to service its legitimate customers, and adding to the plaintiff's personnel costs).

Plaintiff's allegations in the instant case reflect the frustration of many computer users, and are analogous to harms alleged by the ISP plaintiffs in the CompuServe line of cases. Simply put, plaintiff alleges that Spyware interfered with and damaged his personal property, namely his computer and his Internet connection, by over-burdening their resources and diminishing their functioning. Accordingly, the court denies DirectRevenue's motion to dismiss Count 1.

AccuQuote and aQuantive argue that even if plaintiff has stated a cause of action for trespass to personal property against DirectRevenue, plaintiff fails to state a claim against them. AccuQuote, which advertises on the Internet, argues that plaintiff fails to allege that he received an advertisement from AccuQuote. AQuantive, an Internet marketing company, argues that plaintiff fails to allege that he received an advertisement from a company marketed by aQuantive, and that aQuantive is merely an "ad server" for pop-up advertisements. According to aQuantive, as an ad server, it sends pop-up advertisements to computers that "request" the advertisements, and it has no knowledge or control over whether the computer user has consented to the terms of the EULA.

AccuQuote and aQuantive's arguments that plaintiff fails to allege that he received advertisements from them are defeated by a fair reading of the complaint, to which plaintiff is entitled on a motion to dismiss. The named plaintiff expressly alleges that he is a member of the putative class of plaintiffs, and alleges that aQuantive and AccuQuote, or their agents, use

18

DirectRevenue to send targeted advertisements to the class members' computers. In addition, plaintiff clarifies in his briefs and attached declarations that he received advertisements from AccuQuote and Netflix, a company that plaintiff alleges employs aQuantive's "ad-serving" services to send advertisements to computers with Spyware.

AccuQuote and aQuantive argue that DirectRevenue, not they, caused advertisements to be sent to plaintiff's computer, and that plaintiff fails to allege their participation or knowledge of DirectRevenue's actions. AccuQuote and aQuantive ask too much of plaintiff under the liberal standards of the Federal Rules of Civil Procedure, which do not require fact pleading. See Fed. R. Civ. P. 8(a)(2). At the motion to dismiss stage, a plaintiff need not allege all of the facts involved in the claim. Higgs v. Carver, 286 F.3d 437, 439 (7th Cir. 2002); Kyle v. Morton High School, 144 F.3d 448, 454-55 (7th Cir. 1998). A plaintiff may plead conclusions, so long as the conclusions "provide the defendant with at least minimal notice of the claim." Kyle, 144 F.3d at 455. Plaintiff's allegations that aQuantive works "in cooperation with" DirectRevenue to download advertisements, that AccuQuote utilizes Spyware to send unwanted advertisements, and that both defendants have access through DirectRevenue to millions of computers for their targeted advertisements are sufficient to provide the required notice. In addition, aQuantive and AccuQuote's factual contentions that they had no role in causing the advertisements to appear on a user's computer or no relationship with DirectRevenue are inappropriate on a motion to dismiss.

AccuQuote and aQuantive also argue that plaintiff fails to allege that they intended to trespass on his computer, or that they had knowledge of DirectRevenue's unlawful activities or whether advertisements they sent or served were received by computers on which Spyware had

19

been improperly installed. An intentional act is a required element of a trespass to personal property claim, but a plaintiff need not allege an intent to violate the law. See RESTATEMENT (SECOND) OF TORTS, § 217 cmt c ("Such an intention is present when an act is done for the purpose of using or otherwise intermeddling with a chattel or with knowledge that such an intermeddling will, to a substantial certainty, result from the act. It is not necessary that the actor should know or have reason to know that such intermeddling is a violation of the possessory rights of another.").

In support of its argument, aQuantive cites In re Starlink Corn Prods. Liability Litig., 212 F. Supp. 2d 828, 844 (N.D.Ill. 2002), a conversion case. Unlike the plaintiff in Starlink, however, plaintiff in the instant case expressly alleges that defendants, including AccuQuote and aQuantive, intentionally placed or caused to be placed advertisements through Spyware that unlawfully inferred with plaintiff's use of his computer and his Internet connection. This is sufficient to satisfy the intent element of plaintiff's trespass to personal property claim against AccuQuote and aQuantive.

AccuQuote and aQuantive also argue that plaintiff fails to allege that they caused actual damage to his property. Several of the cases cited by aQuantive in support of this argument, however, are largely inapposite because they are summary judgment rulings. See Pearl Investments, LLC v. Standard I/O, Inc., 257 F. Supp. 2d 326, 354 (D.Me. 2003) (no evidence that defendant's unauthorized access to computer network impaired its condition, quality, or value); Intel Corp. v. Hamidi, 30 Cal.4th 1342, 1351-1354 (Cal. 2003) (no evidence that employee who sent six e-mail messages to several thousand employees over a two-year period impaired the system in any way). The only dismissal cited by aQuantive, DirectTV, Inc. v. Chin, 2003 WL

20

22102144, at *2 (W.D.Tex. Aug. 26, 2003), also cited by AccuQuote, is not binding on this court and is distinguishable. The Direct TV court dismissed the counter-plaintiff's trespass to chattels claim where he alleged generally that "on more than one occasion," he expended "time and resources" to delete pop-up advertisements from the counter-defendant, holding that the counter-plaintiff alleged "no facts" supporting damage. Id. In the instant case, by contrast, plaintiff has alleged that the advertisements caused significantly more injury than occasional wasted time and resources, as discussed above, and his pleading provides more specific details than the scant allegations in DirectTV.

AccuQuote and aQuantive also assert that because each individual advertisement can be closed by the computer user as it appears, they cannot cause any actionable injury. This argument ignores the reality of computer and Internet use[9], and plaintiff's allegation that part of the injury is the cumulative harm caused by the volume and frequency of the advertisements. The fact that a computer user has the ability to close each pop-up advertisement as it appears does not necessarily mitigate the damages alleged by plaintiff, which include wasted time, computer security breaches, lost productivity, and additional burdens on the computer's memory and display capabilities. Although plaintiff does not allege that AccuQuote and aQuantive are responsible for every pop-up advertisement that he has received, he alleges that they caused at least some of the estimated 1.5 billion advertising impressions generated by DirectRevenue per

---

[9] See e.g., Geoffrey D. Wilson, Comment, Internet Pop-Up Ads: Your Days Are Numbered! The Supreme Court of California Announces A Workable Standard for Trespass to Chattels in Electronic Communications, 87 LOY. L.A. ENT. L. REV. 567, 573 (2004) (pop-up advertisements can cause connections to slow down and often cause the user to inadvertently open a website that may expose the computer to viruses, software bugs, or even more pop-ups).

21

month, a portion of which were received by his computer. Indeed, AccuQuote admits that a marketing agency it employed placed what it describes as an "insignificant portion" of its advertisements through companies such as DirectRevenue. Questions of fact regarding how many, if any, of these advertisements caused the harms alleged by plaintiff are for a summary judgement motion or trial. At this stage in the litigation, plaintiff has sufficiently alleged that he was damaged by the alleged trespasses of AccuQuote and aQuantive on his computer.

Accordingly, the court denies the motions to dismiss Count I.

## IV. Illinois Consumer Fraud Act (Count II)

Count II of plaintiff's complaint asserts that DirectRevenue violated the Illinois Consumer Fraud and Deceptive Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1 et seq., through deceptive and misleading advertisements promising "free" software downloads, when in fact the software was clandestinely bundled with Spyware. DirectRevenue argues that Count II is not pled with sufficient particularity, as required of fraud claims under Fed. R. Civ. P. 9(b). Plaintiff responds that he is not alleging fraud because Count III incorporates violations of the Illinois Deceptive Practices Act ("Deceptive Practices Act"), 815 ILCS 510/1 et seq., which applies to deceptive business practices that do not rise to the level of fraud.

This court has held that the Consumer Fraud Act covers several types of conduct in addition to fraud, including all practices that violate § 2 of the Deceptive Trade Practices Act. Publications Intern., Ltd. v. Leapfrog Enterprises, Inc., 2002 WL 3142665, at *5-6 (N.D.Ill. Oct. 29, 2002). Section 2 of the Deceptive Trade Practices Act provides relief for business activities that create "confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," as well as "any other conduct which similarly creates a likelihood of

22

confusion or misunderstanding. 815 ILCS 501/2. Such activity does not necessarily constitute fraud in a manner that would implicate Rule 9(b). Leapfrog, 2002 WL 3142665, at *6.

In the instant case, it is not clear from the complaint whether plaintiff asserts a claim under the Consumer Fraud Act or the Deceptive Trade Practices Act because plaintiff uses language that suggests both: "false" and "falsely," as well as "confuse, deceive, and mislead." In his response to the motion to dismiss, however, plaintiff expressly disavows any fraud claim, and states that he asserts Count II under the Deceptive Trade Practices Act, as incorporated into the Consumer Fraud Act. Leapfrog is thus on all-fours with the instant case, and Count II is not subject to the heightened pleading standings of Rule 9(b). DirectRevenue does not argue that plaintiff fails to meet the more liberal standards of federal notice pleading under Rule 8(a). Accordingly, the motion to dismiss Count II is denied.

## V.    Unjust enrichment (Count III)

Count III asserts a claim for unjust enrichment against all defendants, alleging that they turned his computer into an "advertising machine." Plaintiff claims that defendants were unjustly enriched to his detriment because aQuantive and DirectRevenue earned additional advertising fees, and AccuQuote "earned business that it was not entitled to receive." According to plaintiff, if consumers learned of defendants' deceptive marketing and advertising practices, they would have lessened or stopped their business with dealings with AccuQuote, and "reputable companies would no longer be willing to advertise" through aQuantive or DirectRevenue. Defendants argue in three separate motions to dismiss that plaintiff is seeking recovery of a benefit that was transferred to DirectRevenue by third parties, and to which plaintiff is not entitled.

23

The Illinois Supreme Court has held that where the alleged benefit flows from a third party to the defendant, "retention of the benefit would be unjust where: (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit through the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant." HPI Health Care Serv., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 160 (1989). Plaintiff argues that the second scenario applies to the instant case.

A defendant's "wrongful conduct" alone will not support a claim for unjust enrichment under the second method if plaintiff has no "claim" or "entitlement" to the monies. See Association Benefit Serv., Inc. v. Advanceps Holding Corp., 2004 WL 2101928, at *3 (N.D.Ill. Sept. 21, 2004); Asch v. Teller, Levit & Silvertrust, P.C., 2003 WL 22232801, at *7 (N.D.Ill. Sept. 26, 2003). In Asch, the court found that the defendants engaged in wrongful conduct by collecting inflated fees on the plaintiffs' accounts from a third-party, but that the plaintiffs failed to state a claim for unjust enrichment because they were not entitled to the fees. Similarly, although plaintiff in the instant case alleges wrongful conduct by defendants, he has failed to allege that he is entitled to the advertising fees paid to aQuantive or DirectRevenue, or to any increased revenues earned by AccuQuote. Plaintiff also does not allege that he paid any money to any of the defendants. See McCabe v. Crawford & Co., 210 F.R.D. 631, 642-43 (N.D.Ill. 2002) (dismissing unjust enrichment claim because plaintiff did not allege that he paid any money to defendants).

Plaintiff does not attempt to distinguish Asch, McCabe, or Association Benefit, but cites Lilly v. Ford Motor Co, 2002 WL 84603, at *6 (N.D.Ill. Jan. 22, 2002), in support of his argument

24

that because defendants received a financial benefit as a result of their advertisements and advertisement sales, they were unjustly enriched. Lilly, however, is readily distinguishable because the plaintiffs in Lilly were owners of defective Ford vehicles who alleged that Ford had profited from illegal advertising by inducing them to buy the products. Id. In the instant case, plaintiff does not allege that he purchased anything from defendants, or as a result of the advertisements.[10]

Accordingly, the court grants the motion to dismiss Count III.

## VI.  Negligence (Count IV)

Count IV asserts that DirectRevenue breached its duty not to harm plaintiff's computers and its duty to monitor Spyware distributors to ensure that they received user consent prior to installing Spyware. Count IV states that it incorporates by reference the allegations of the preceding paragraphs of the complaint. DirectRevenue argues that plaintiff fails to state a negligence claim regarding harm to plaintiff's computer because plaintiff alleges intentional acts for the same conduct he asserts as the basis of his negligence claim, and that he fails to state a claim regarding the distributors because they are independent contractors.

Under Fed. R. Civ. P. 8(e)(2), at the pleading stage plaintiffs may plead in the alternative, even if this creates inconsistencies. Alper v. Altheimer & Gray, 257 F.3d 680, 687 (7th Cir. 2001). Plaintiff alleges that DirectRevenue negligently damaged his computer, and he clarifies in his

---

[10] The court notes that plaintiff's unjust enrichment claim may be more properly characterized as an equitable remedy for his substantive claims rather than a separate cause of action. Indeed, plaintiff argues that he "is entitled to whatever money [AccuQuote and aQuantive] earned because that money should compensate him for damage to his computer." See Collier v. Murphy, 2003 WL 1606637, at * 4 (N.D.Ill. Mar. 26, 2003) (unjust enrichment count merely claim for relief based on substantive counts).

25

response to the motion to dismiss that while the download of Spyware was intentional, the resulting damages were negligently caused. Construing the complaint in favor of plaintiff, he has pled his negligence claim in the alternative.

To state a cause of action for negligence under Illinois law, a plaintiff must allege "the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." Ward v. Kmart Corp., 136 Ill.2d 132, 140 (Ill. 1990). In Count IV, plaintiff expressly defines Direct Revenue's duty to the class members: "DirectRevenue, having gained access to Plaintiffs' computers, had a duty not to harm the computers and impact their operation." Plaintiff has also sufficiently alleged that Spyware was the proximate cause of damage to his computer, as discussed above. Accordingly, the court denies DirectRevenue's motion to dismiss Count IV as to the harm caused to plaintiff's computer by Spyware.

DirectRevenue argues that Count IV should also be dismissed as to the Spyware distributors because they are independent contractors, and DirectRevenue is thus not liable for their negligence. In general, one cannot be held liable for the conduct of an independent contractor. Kouba v. East Joliet Bank, 135 Ill. App. 3d 264, 267 (1985). The test of whether one is an independent contractor or employee is the extent of the employer's right to control the manner and method in which the work is to be carried on. Id.; see also Horwitz v. Holabird & Root, 212 Ill. 2d 1, 13 (2004) (independent contractor is one who, though performing some work for another, is not subject to that other's orders or control, and may use his own discretion with respect to the details of the work).

26

"The question of whether the parties' relationship is that of principal and agent or independent contractor is a question of fact unless the relationship is so clear that is it undisputable." Commerce Bank v. Youth Services of Mid-Illinois, Inc., 333 Ill. App. 3d 150 (4th Dist. 2002). In the instant case, plaintiff's complaint refers to "[DirectRevenue]'s distributors," which he does not allege are independent contractors, and plaintiff argues in his response to the motion to dismiss that the Spyware distributors are controlled by DirectRevenue. DirectRevenue counters that the distributors are independent contractors, and directs the court to a distribution agreement attached to Dowhan's declaration. The distribution agreement, however, was not referenced in the complaint, and cannot be considered on a motion to dismiss, which is limited to the factual allegations contained within the four corners of the complaint. Hill v. Trustees of Ind. Univ., 537 F.2d 248, 251 (7th Cir. 1976); see also City of Evanston v. Central Realty, Inc., 1990 WL 7185, at *2 (N.D.Ill. Jan. 17, 1990) (refusing to consider proof of the fact that plaintiff was an independent contractor on motion to dismiss).

Although plaintiff's allegations regarding the distributors are limited, he alleges a duty and a breach of that duty, which is sufficient to survive a motion to dismiss his negligence claim. As explained above, a plaintiff may plead conclusions. See Higgs, 286 F.3d at 439 (7th Cir. 2002); Kyle, 144 F.3d at 454-55. Accordingly, the court denies the motion to dismiss Count IV.

## VII. Computer tampering - criminal code (Count V)

Count V of the amended complaint states a claim against DirectRevenue under Illinois' Computer Crime Prevention Law ("CPPL"), 720 ILCS 5/16D-1 et seq. The CPPL is contained in the Illinois Criminal Code, but § 16D-3(c) provides for a civil action for a violation of subsection 3(a)(4). Subsection (a)(4) is violated when a person "knowingly and without the authorization of

27

a computer's owner" inserts a program onto a computer knowing that the program may damage the computer. 720 ILCS 5/16D-3(a)(4).[11] The parties do not cite, and the court has been unable to identify, any case law applying this subsection of the CPPL, which was passed into law in 1989, although at least one court has noted that civil actions are authorized for violations of § 16D-3(a)(4). See Allstate Ins. Co. v. Mathison, 2002 WL 1396951, at *3 (N.D.Ill. Jun. 26, 2002).

The statute applies to unauthorized computer access. DirectRevenue's only argument in support of its motion to dismiss Count V is that plaintiff authorized the download of Spyware to his computer. Plaintiff, however, as discussed above, has sufficiently alleged that the installation of Spyware on his computer was unauthorized. Accordingly, the court denies the motion to dismiss Count V.

## CONCLUSION

For the reasons stated above, the court grants DR Holdings's motion to dismiss. The court denies the motion to stay in favor of arbitration. The court denies the motions to dismiss Count I, Count II, Count IV, and Count V. The court grants the motion to dismiss Count III. Plaintiff is directed to file an amended complaint consistent with this opinion on or before September 19, 2005; defendants shall answer the amended complaint on or before October 10, 2005. The parties

---

[11] A person violates 720 ILCS 5/16D-3(a)(4) when he, "Inserts or attempts to insert a "program" into a computer or computer program knowing or having reason to believe that such a "program" contains information or commands that will or may damage or destroy that computer, or any other computer subsequently accessing or being accessed by that computer, or that will or may alter, delete or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently accessing or being accessed by that computer, or that will or may cause loss to the users of that computer or the uses of a computer which accesses or which is accessed by such "program."

28

are directed to confer, prepare and file a joint status report using this court's form on or before

October 13, 2005. This matter is set for a report on status October 19, 2005, at 9:00 a.m.

**ENTER:**     **August 29, 2005**

**Robert W. Gettleman**
**United States District Judge**